**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

02 JAN 31  PM 5: 15

|  |  |  |
|---|---|---|
| **AVA L. MILLER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CV 01-BU-1277-S** |
| | ) | |
| **BED, BATH & BEYOND, INC.,** | ) | |
| | ) | **ENTERED** |
| **Defendant.** | ) | |

JAN 3 1 2002

## Memorandum Opinion

In the above-styled action, Plaintiff Ava L. Miller brings claims alleging that her employer, Defendant Bed, Bath & Beyond, Inc., subjected her to unlawful race and color discrimination and to retaliation, in violation of both Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981. Now before the Court is Defendant's amended motion for summary judgment, filed January 4, 2002. (Doc. 27).[1] The parties have submitted evidence and briefs in support of their respective positions on the motion, which is now ripe for decision. The Court concludes that Defendant's motion for summary judgment is due to be

---

[1]Defendant filed its "original" motion for summary judgment, with an incorporated supporting brief on December 11, 2001. On December 26, 2001, this Court entered an order striking Defendant's incorporated supporting brief because it failed to comply with Appendix A, which governs the formatting of dispositive motion briefs for the undersigned Judge.

37

**GRANTED.**

## I.   SUMMARY JUDGMENT STANDARDS

On a motion for summary judgment, the court assesses all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial is present. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). A party seeking summary judgment has the initial responsibility of informing the Court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. <u>Celotex</u>, at 323. See also <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its to initial burden, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." <u>Howard v. BP Oil Company</u>, 32 F.3d 520, 523 (11th Cir. 1994). In

resolving whether a given factual dispute requires submission to a jury, a district court must view the record in the light most favorable to the nonmoving party and resolve all reasonable inferences in the nonmovant's favor. <u>Rooney v. Watson</u>, 101 F.3d 1378, 1380 (11th Cir. 1996) (<u>citing</u> <u>Hale v. Tallapoosa Co.</u>, 50 F.3d 1579, 1581 (11th Cir. 1995)). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted or unimpeached, at least to the extent that that evidence comes from disinterested witnesses.' " <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 151 (2000) (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p.299). Keeping these standards in mind, the Court turns to the record in this case.

## II. BACKGROUND[2]

### A. Plaintiff's Duties

Defendant operates a nationwide chain of retail stores that sells domestics merchandise and home furnishings. Plaintiff, who is African-American, began working at Defendant's No. 98 store located in Hoover, Alabama when it opened in October 1995. In

---

[2]"The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the record. These are the 'facts' for summary judgment purposes only. They may not be the actual facts. <u>See</u> <u>Cox v. Administrator U.S. Steel & Carnegie</u>, 17 F.3d 1386, 1400 (11th Cir. 1994)." <u>Underwood v. Life Ins. Co. of Georgia</u>, 14 F.Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

January 1996, after working initially as a greeter, Plaintiff was transferred to the bedding department, where she worked in an hourly position as an associate. As a bedding associate, Plaintiff was responsible for assisting customers and making sure that the merchandise in that department was stocked and presentable.

Sometime in 1995, Defendant hired one Curtis Thomas to be the maintenance associate at the Hoover store.  As such, Thomas was responsible for the cleanliness of the store, including cleaning the restrooms, vacuuming, sweeping, and collecting trash.  At the end of January 1996, however, Thomas was terminated, and for several weeks thereafter customers complained about the restrooms being dirty.  Viewing this situation as an opportunity to demonstrate her initiative, Plaintiff approached then-store manager Michael Mittelmark, who is Caucasian, and volunteered to clean the restrooms until he hired a replacement maintenance associate. Mittelmark gratefully accepted Plaintiff's offer.

As months passed, however, Mittelmark failed to hire a replacement for Thomas.  During that period Plaintiff continued not only to clean the restrooms and perform duties in the bedding department, but she also took on most or all of the various other maintenance functions that previously had been performed by Thomas, such as vacuuming, sweeping, and collecting trash throughout the store.  Plaintiff says she began to do these other maintenance

duties because the other employees "just assumed" that she would do them.

By June 1997, Mittelmark ceased to be the store manager, and he left without having hired a new employee to occupy the post of maintenance associate.   Indeed, there have been four other store managers at Hoover since Mittelmark's departure, Ronald Potts (Caucasian, June 1997 to October 1998), Kelly Freeman (African-American, October 1998 to July 1999); Vic Saad (Middle Eastern, July 1999 to May 2000), and Randi Silverberg (Caucasian, since May 2000), and none of them hired a formal maintenance associate either.  As a result, Plaintiff has continued to perform the chores of such position on a daily basis up to the present day, on top of other duties she does.   Further, she claims that she has been the only employee at the store who regularly performs maintenance tasks.

In examining the Plaintiff's normal daily routine, the record indicates that Plaintiff is scheduled to work from 6:00 a.m. to 2:30 p.m., each Monday through Thursday, and from 8:00 a.m. to 4:00 p.m. each Saturday.  Plaintiff usually spends about the first two hours of each workday on maintenance duties.   After that, on Saturdays she covers the bedding department until she leaves, while on weekdays she is advised of the department to which she will be assigned during the rest of the day.  On weekdays, she spends most

of her time processing and stocking newly-received merchandise, as well as providing customer service and assisting in various departments as needed. Plaintiff also notes that she helps cover the bedding department whenever the department manager or the regularly scheduled bedding associate is absent or at lunch.

Despite having regularly performed the duties previously assigned to Thomas since early 1996, at no time has Plaintiff regarded herself as being a "maintenance associate." Rather, Plaintiff has always considered herself first to be an associate who works primarily out of the bedding department.[3] Nonetheless, the record indicates that the members of upper management came at some point to categorize her not as a bedding associate, but as an employee whose primary duties were maintenance, while recognizing that she also performed miscellaneous duties in departments throughout the store. Three of the four store managers after Mittelmark under whom Plaintiff worked, Potts, Freeman, and Silverberg, each testified that he or she simply understood that Plaintiff was a maintenance employee. Similarly, although there was a work schedule posted for employees assigned to the bedding department, Plaintiff's name has not appeared on it for at least

_____

[3]Plaintiff alleges that except for an approximately eight-month period in about 1998 when she was assigned to the lifestyles department, which contains kitchen items, such as napkins, furniture, brooms, and mops, she has worked primarily out of the bedding department.

several years; instead, she has been scheduled out of the operations department, which includes maintenance and receiving employees.   Similarly, as early as July 1997, her employee evaluation forms indicated that she was, at least in part, a "maintenance" employee.[4]  Plaintiff explains, however, that because she allegedly possesses superior experience, customer service skills, and product knowledge in all areas of the store, she actually "works out of all the departments."   And she has been categorized as a maintenance employee for scheduling and review purposes, she claims, only because she has a "unique" position at the store and management "just basically didn't know where [she] went."  Plaintiff's Dep. at 114.

Plaintiff admits that she initially volunteered to perform some maintenance duties, but she states that she agreed to do so only until a replacement maintenance associate could be hired. Although she was unhappy with continuing to perform the duties of the former maintenance associate when no one else was hired and other employees did not regularly do any such work, she did not

---

[4]Plaintiff's October 18, 1996 employee review actually lists her department as "Maintenance." Plaintiff's alleges, however, that this document did not contain such a denomination at the time she received it.   For purposes of summary judgment, the Court credits Plaintiff's assertion on this point, as she is the non-movant.   However, Plaintiff does not dispute that her evaluation of July 14, 1997 states that her department was "Maintenance/Sales," or that her August 1998 and August 2001 evaluations were printed on forms titled,"Receiving/ Maintenance/ Overnight Performance Review."  See Defendant's Exhibit 10.

want to give the impression that she was unwilling to do whatever was necessary for the store.  She alleges that she once mentioned to Kelly Freeman when he was Store Manager, several years after she would have been performing the maintenance duties, that she had come do such duties only because she had told Mittelmark that she would clean the bathrooms until a replacement Maintenance Associate was hired but that no one ever was.  However, Plaintiff never actually complained to any of the store managers that she should not have to continue to perform maintenance duties, nor did she ever ask them whether or when a proper replacement maintenance associate might be hired.

### B.  Denied Promotions

Plaintiff claims that Defendant is liable for having unlawfully denied her promotions to eight managerial positions between 1997 and 2001.  Below is a list of the positions Plaintiff claims she would have been awarded but for race or color discrimination, the dates the positions were filled, and the name and race of the person who ultimately received each position:

> Sales Force Manager, late July or early August 1997,
> Angela Miller Simpson, African-American;
>
> Lifestyles Department Manager, mid-1997,
> Larry Langston, white;
>
> Sales Force Manager, March 1999,
> Patricia Caswell, white;

Assistant Store Manager-Operations, September 1999,
Leslie Davis, white;

Bedding Department Manager, October 1999,
Lisa Greer, white;

Bedding Department Manager, September 2000,
Lila Yettou, white;

Sales Force Manager, late February or early March 2001,
Lorre Prisby, African-American; and

Bedding Department Manager, March 2001,
Joe McConnell, white.

Each of these positions was located at the Hoover store with the
exception of the sales force manager position filled by Patricia
Caswell in March 1999.   That job was at the Defendant's store in
Mountain Brook, Alabama.

The final decisions on these promotions were made by Ron
Potts.  Potts, who is white, was the manager of the Hoover store
from June 1997 to October 1998; an area manager from mid-1998
(while he also remained store manager) until spring 1999; and, from
that latter time to the present, the district manager over all five
of Defendant's stores in Alabama, as well as one in Georgia.  Potts
acknowledges that he also may receive "input" regarding promotion
decisions from his store managers.  However, Potts also suggests
that he is generally familiar with the work of Plaintiff and other
employees at the Hoover store, as she was employed there when he
was the store manager, and, since being promoted to district

manager, he still has an office at the store and is there approximately two days per week on average.

Shortly after Potts became store manager in 1997, Plaintiff told him that she was interested in being promoted to a management position.   Nonetheless, Potts acknowledges that he has never considered promoting her, nor has he had any discussions with his store managers regarding the possibility of doing so.   This is because, he states, he does not consider her qualified to be a manager.   He admits that associates are not formally required to possess any particular objective minimum qualifications, such as a certain level of schooling or past managerial experience, in order to be eligible for a promotion to a management position.   He maintains, however, that when considering whether to promote an associate to management he looks primarily at an employee's "performance" and "work ethic," and he allegedly finds Plaintiff to be somewhat wanting in those areas.   Potts likewise suggests that he found the candidates whom he either hired from outside the company or transferred from within it to fill the positions in question for non-discriminatory reasons concerning the candidates' qualifications.

## C.  EEOC Charge and Filing Suit

On March 2, 2001, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").   In her

charge, Plaintiff asserted her belief that she had been discriminated against on the basis of color and subjected to retaliation, in violation of Title VII. She stated, in pertinent part, that "[since] July 1997 and continuing" she had applied but was rejected for "some promotions into positions that [she was] qualified to fill" but "each time the employer has promoted a White with less experience and qualifications." She also averred specifically that she had been denied a promotion to sales force manager on February 26, 2001. Plaintiff further added that her employer had "selected an extremely fair skinned Black, who appears to be White in lieu of awarding [her] the position."

After receiving a right-to-sue notice from the EEOC, Plaintiff filed this action on May 17, 2001. In her complaint, Plaintiff advances claims under Title VII and Section 1981, alleging that she has been denied promotions to several positions that were given to less experienced, less qualified white or lighter-skinned individuals. She also maintains that she has been subjected to different terms and conditions of employment because of race, in that she is made to perform cleaning and maintenance duties while non-black employees are not made to do so. Finally, Plaintiff alleges that she has been subjected to retaliation, the form of which is not specified, by Defendant for reporting practices made illegal under Title VII and Section 1981. For these alleged

unlawful acts, Plaintiff seeks injunctive and declaratory relief,[5] as well as compensatory and punitive damages, costs, and reasonable attorney's fees.

Plaintiff contends that after she filed her EEOC charge and associated lawsuit, she was subjected to retaliation by Ron Potts and Randi Silverberg, the incumbent store manager at Hoover. She now alleges that such retaliation took three forms. First, she asserts that Defendant terminated her daughter, Special Jones. Second, Plaintiff maintains that Silverberg instructed the assistant and department managers that they were not to use Plaintiff to help out in the departments because she was a maintenance employee. And third, Plaintiff now alleges that she has not been considered for promotions because of her EEOC charge and lawsuit.

IV.  DISCUSSION

A.  **Discrimination Claims--The Statutory Framework**

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §

---

[5]The Court notes that the complaint also expressly seeks a "judgment declaring that Plaintiff's firing was an unlawful employment practice under Title VII . . . and 42 U.S.C. sec. 1981 as amended." However, the record shows without dispute that Plaintiff has not been fired by Defendant.

2000e-2(a)(1). Section 1981 guarantees to all persons in the United States "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Section 1981, like Title VII, prohibits discrimination on the basis of color, as well as race. See Walker v. Secretary of Treasury, I.R.S., 713 F. Supp. 403, 408 (N.D. Ga. 1989), aff'd 953 F.2d 650 (11ᵗʰ Cir. 1992)(table).[6] Further, following the passage of the Civil Rights Act of 1991, the term "make and enforce contracts" in is broadly defined as including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). The Eleventh Circuit has recognized that claims alleging unlawful disparate treatment in employment under Title VII and § 1981 have the same substantive proof requirements and are analyzed under the same framework. See e.g., Bass v. Board of County Com'rs, Orange County, Florida, 256 F.3d 1095, 1109 n.4 (11ᵗʰ Cir. 2001); Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330 (11ᵗʰ Cir. 1998).

**B. Administrative Prerequisites and Timeliness**

---

[6] Although it is not entirely clear, Defendant appears perhaps to assume that Plaintiff's claims alleging unlawful color discrimination are based exclusively upon Title VII while her claims alleging unlawful race discrimination are based exclusively upon § 1981. However, there is no basis for reading Plaintiff's complaint so restrictively, and because both Title VII and § 1981 prohibit intentional discrimination in employment based upon both race and color, the Court interprets Plaintiff's allegations as going toward claims under both statutes.

Defendant argues that a number of Plaintiff's Title VII and §
1981 failure-to-promote claims are untimely.  While the substantive
elements of proof are the same for claims alleging intentional
employment race or color discrimination whether brought pursuant to
Title VII or § 1981, the administrative requirements and the rules
regarding the timeliness of claims differ greatly depending upon
which statute is involved.  Title VII requires a plaintiff in a
non-deferral state, such as Alabama, to have filed a charge of
discrimination with the EEOC no more than 180 days after "the
alleged unlawful employment practice occurred."  42 U.S.C. §
2000e-5(e)(1).  See Hipp v. Liberty Nat. Life Ins. Co., 252 F.3d
1208, 1220 (11th Cir. 2001); Stewart v. Booker T. Washington Ins.,
232 F.3d 844, 848 (11th Cir. 2000).  Thus, a Title VII claim founded
upon a discriminatory job action that occurred prior to 180 days
before the charge was filed will generally be deemed untimely and
subject to dismissal.  Id.  Section 1981, by contrast, does not
require a plaintiff to pursue administrative remedies with the EEOC
before bringing suit.  See Patterson v. McLean Credit Union, 491
U.S. 164, 180-81 (1989); Johnson v. Railway Exp. Agency, Inc., 421
U.S. 454, 460 (1975) ("[T]he filing of a Title VII charge and
resort to Title VII's administrative machinery are not
prerequisites for the institution of a s 1981 action"); Caldwell v.

National Brewing Co., 443 F.2d 1044, 1046 (5th Cir. 1971)[7].
Instead, § 1981 claims are subject to the state personal injury
statute of limitations, which in Alabama is two years. <u>See</u>
<u>Peterson v. BMI Refractories</u>, 132 F.3d 1405, 1414 n.16 (11th Cir.
1998).

Because Plaintiff filed her EEOC charge on March 2, 2001,
Defendant argues that promotions that Plaintiff was allegedly
denied for reasons of race or color more than 180 days prior to
that date, or September 2, 2000, cannot form the basis of a valid
Title VII claim.   Likewise, Defendant argues that Plaintiff's §
1981 claims cannot be based on promotions that she was denied more
than two years before she filed her complaint, or May 17, 1999.

Plaintiff responds by arguing that all of her promotion claims
are timely under Title VII and § 1981 under a "continuing
violation" theory.  Under this doctrine, where an employee charges
an employer with continuously maintaining an employment practice
that is violative of Title VII, she may file a valid charge of
discrimination based upon that illegal practice until 180 days
after the last occurrence of an instance of that practice.   <u>See</u>
<u>Gonzalez v. Firestone Tire & Rubber Co.</u>, 610 F.2d 241, 249 (5th Cir.

---

[7]All decisions of the United States Court of Appeals for the Fifth Circuit handed down
prior to the close of business on September 30, 1981 are binding precedent in the Eleventh
Circuit. <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

1980).  This doctrine also may be applied to § 1981 claims, allowing an employee to maintain a claim by showing that the employer continued to apply a discriminatory policy within two years of filing suit.  Id. at 250.  However, a continuing violation does not occur simply because the employee continues to feel the effect of a discrete discriminatory act that occurred outside the limitations period.  See Stewart, 232 F.3d at 853; Ross v. Buckeye Cellulose Corp., 980 F.2d 648, 658 (11th Cir. 1993).  Furthermore, the Eleventh Circuit has indicated that, in the absence of a continuing discriminatory policy, a plaintiff cannot extend the life of an otherwise barred failure-to-promote claim under the continuing violation doctrine, for such an employment action is generally deemed a discrete act of past discrimination.  See Thigpen v. Bibb County, Georgia, Sheriff's Dept., 223 F.3d 1231, 1244 (11th Cir. 2000); Scarlett v. Seaboard Coast Line R. Co., 676 F.2d 1043, 1050 (5th Cir. Unit B 1982)[8]; Gonzalez, 610 F.2d at 249-50.

Plaintiff does not suggest that the failure to promote her was the result of any racially discriminatory policy promulgated by Defendant.  Rather, she claims only that she was denied each

---

[8]All of the post-September 30, 1981 decisions of Unit B of the former Fifth Circuit are binding precedent in the Eleventh Circuit.  Stein v. Reynolds Securities, Inc., 667 F.2d 33, 34 (11th Cir. 1982).

promotion in question because the relevant individual or individuals responsible for the decisions harbored a bias based upon race or color, which was actually contrary to Defendant's policy, published in its employee handbook, prohibiting such discrimination. Plaintiff's promotion claims are thus based upon allegations of discrete discriminatory acts, and if they occurred outside of the relevant limitations periods they cannot be saved under the continuing violations theory. Accordingly, the Court concludes that Plaintiff cannot recover under either Title VII or § 1981 based upon her failure to receive promotions to the following positions, as she was rejected for them before both September 2, 2000 (180 days before she filed her EEOC charge) and May 17, 1999 (two years before she filed her complaint): (1) the sales force manager job granted to Angela Miller Simpson in late July or early August 1997; (2) the lifestyles department manager position awarded to Larry Langston in mid-1997; and (3) the sales force manager position that went to Patricia Caswell in March 1999. In addition, Plaintiff's Title VII failure-to-promote claims are precluded for the following positions, although they are NOT barred under § 1981 because they occurred after May 17, 1999: (1) the assistant store manager job that was filled with Leslie Davis in September 1999; and (2) the bedding department manager position that went to Lisa Greer in October 1999.

Defendant further argues that Plaintiff has not satisfied the administrative prerequisites to pursue a Title VII color discrimination claim founded upon her failure to receive the sales force manager job awarded to Lorre Prisby.  Defendant avers that Prisby filled this position on March 5, 2001, three days after Plaintiff filed her EEOC charge.  Defendant argues, therefore, that Plaintiff's charge did not encompass a claim based upon Plaintiff's rejection for this position, and because Plaintiff failed to amend her charge thereafter, Defendant urges, Plaintiff should be precluded from pursuing a Title VII claim based upon it.  The Court disagrees.

"The starting point of ascertaining the permissible scope of a judicial complaint alleging employment discrimination is the administrative charge and investigation."  <u>Alexander v. Fulton County, Ga.</u>, 207 F.3d 1303, 1332 (11th Cir. 2000).  "A Title VII action, however, may be based 'not only upon the specific complaints made by the employee's initial EEOC charge, but also upon any kind of discrimination like or related to the charge's allegations, limited only by the scope of the EEOC investigation that could reasonably be expected to grow out of the initial charges of discrimination.'"  <u>Chanda v. Engelhard/ICC</u>, 234 F.3d 1219, 1225 (11th Cir. 2001) (quoting <u>Fine v. GAF Chemical Corp.</u>, 995 F.2d 576, 578 (5th Cir. 1993) (quoting <u>Fellows v. Universal</u>

*Restaurants Inc.*, 701 F.2d 447, 451 (5th Cir. 1983))).  Therefore, an EEOC charge that challenges particular denied promotions may be broad enough to allow judicial claims regarding denied promotions regarding other positions.  *See, e.g.*, *Turner v. Orr*, 804 F.2d 1223, 1226 (11th Cir. 1986); *Gamble v. Birmingham Southern R. Co.*, 514 F.2d 678, 689 (5th Cir. 1975).  Indeed, one district court in this circuit has recently held that where a plaintiff's original charge alleged discriminatory denials of promotions, the investigation could reasonably be expected to include investigation of future denials of promotions as long as the case was still pending before the EEOC; thus, the plaintiff was permitted to pursue other promotion claims not specified in the charge but that arose out of positions denied between the filing of his original charge and the EEOC's issuance of a right-to-sue notice.  *Butler v. Matsushita Communication Industrial Corp.*, 203 F.R.D. 575, 581 (N.D. Ga. 2001).  However, this Court need not even go that far here with regard to Plaintiff's Title VII claim regarding the position granted to Prisby.

Plaintiff's EEOC charge specifically states that she was denied a promotion to a "sale (sic) force manager" position on February 26, 2001, and she alludes to the fact that the successful applicant was an "extremely fair skinned Black."  Defendant acknowledges that Lorre Prisby, who is a fair-skinned African-

American, was officially awarded a sales force manager position on March 5, 2001.  Plaintiff's EEOC charge was filed three days prior, as Defendant emphasizes.  Nonetheless, examining the specific job vacancies that Plaintiff claims she was denied because of discrimination and the color of the respective successful applicants, it is simply unmistakable that Plaintiff's EEOC charge is actually referring to the position awarded to Prisby.  So regardless of the date that Prisby may have officially been placed in the sales force manager job, it can hardly be argued that an EEOC investigation would not reasonably encompass Defendant's decision to favor Prisby over Plaintiff.  Therefore, Plaintiff's Title VII claim thereon in this forum is proper.[9]

### C.  Discriminatory Job Assignments

Plaintiff asserts that she was assigned to perform maintenance duties because of race or color.  It is well established that making work assignments along the lines of race or color is forbidden under Title VII and § 1981.[10]  See Ferrill v. The Parker

---

[9]In any event, even if Plaintiff's EEOC charge did not encompass the promotion claim regarding the position awarded to Prisby, such would not affect Plaintiff's ability to bring a color discrimination claim under § 1981 based upon her non-selection for that position.

[10]Because Title VII and § 1981 disparate treatment claims require the same proof to show liability and are analyzed under the same framework, the Court will address Plaintiff's Title VII discriminatory work assignment claims, as well as her other Title VII disparate treatment claims, with the understanding that the analysis applies with equal force to her § 1981 discrimination claims.  See Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).

Group, Inc., 168 F.3d  468, 471-72 (11th Cir. 1999) (affirming in
relevant part district court's holding that § 1981 was violated by
telephone marketer's practice of "race-matching" its employees to
targeted survey respondents); Eubanks v. Pickens-Bond Const. Co.,
635 F.2d 1341, 1345 (8th Cir. 1980) (affirming district court's
finding of disparate treatment based on evidence that black cement
finishers were assigned more undesirable tasks than similarly
situated whites); Smith v. Texas Dep't of Water Resources, 799 F.2d
1026, 1030 (5th Cir. 1986) (female plaintiff made out a prima facie
case of discrimination based on allegations that she, but not her
male counterparts, was ordered to relieve her supervisor's
secretary on a daily basis). Indeed, an employer may be found to
violate Title VII even if the racially discriminatory assignment of
jobs does not translate into economic loss.   See Swint v.
Pullman-Standard, 539 F.2d 77, 89-90 (5th Cir. 1976).

     Plaintiff complains that she was made to perform cleaning and
other maintenance duties while similarly situated white employees
were not.  The Court assumes that this establishes a prima facie
case of discrimination.   However, Plaintiff admits that she
voluntarily assumed, at least initially, the maintenance duties
about which she now complains as a way to demonstrate her
initiative to Michael Mittelmark.  His successors as store manager
indicated that they simply believed that such maintenance duties

were, in fact, part of Plaintiff's job responsibilities and that
she was performing them adequately, so they had no reason to alter
the status quo.  Indeed, Plaintiff herself stated that she believed
Mittelmark and subsequent managers just got "comfortable" with the
good job she did on the maintenance duties so they "procrastinated"
with regard to hiring a formal maintenance associate.  Plaintiff
recognizes, though, that she never expressed discontent to managers
about having to perform maintenance duties, nor did she ask them
about whether or when a new hire or another employee would be
brought in to perform the duties.  Plaintiff does offer that she
told Kelly Freeman when he was the store manager that she had come
to perform maintenance tasks only because she had volunteered to
Mittelmark that she would clean the bathrooms until a replacement
maintenance associate was hired but that none ever was.  But by the
time Freeman became manager in October 1998, Plaintiff had already
been regularly performing the maintenance tasks as part of her
duties for more than two-and-one-half years, and Plaintiff's
statement to Freeman that she had not always performed such tasks
does not tend to indicate that Freeman, who is himself African-
American, or subsequent managers continued to have Plaintiff
perform maintenance tasks because of her race or color.  The Court
concludes that given that Plaintiff voluntarily assumed the
maintenance duties and never complained to store managers about

having such responsibilities as part of her job, there simply is insufficient evidence reasonably indicating either that these circumstances were not the true reason for her maintenance work assignments or that race or color discrimination was more likely the true reason. Accordingly, the Court concludes that Defendant's motion is due to be granted as it pertains to Plaintiff's Title VII and § 1981 claims that she was assigned maintenance duties because of race or color discrimination.

### D.  Discriminatory Failure-To-Promote

Plaintiff claims that she was denied a number of promotions because of race or color, in violation of Title VII and § 1981.  As explained above, Plaintiff cannot recover for some of the positions for which she was rejected because her claims regarding such are untimely.  At this point, only the following of Plaintiff's discriminatory failure-to-promote claims are timely, and thus even potentially viable: (1) assistant store manager-operations, awarded to Leslie Davis, September 1999 (race, § 1981 only); (2) bedding department manager, awarded to Lisa Greer, October 1999 (race, § 1981 only); (3) bedding department manager, awarded to Lila Yettou, September 2000 (race, § 1981 and Title VII); (4) sales force manager, awarded to Lorre Prisby, late February or early March 2001 (color, Title VII and § 1981); and (5) bedding department manager awarded to Joe McConnell, March 2001 (race, § 1981 and Title VII).

Plaintiff attempts to prove her claims with regard to these positions using circumstantial evidence.[11]   When circumstantial evidence is sought to be used to prove a Title VII or § 1981 disparate treatment claim, courts use the analytical framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981).   See also Sledge v. Goodyear Dunlop Tires North America, Ltd., 275 F.3d 1014, 1015 n.1 (11th Cir. 2001).   Under this framework, the plaintiff must first establish a prima facie case of discrimination, which creates a presumption of discrimination.   Once the employee has set forth evidence constituting a prima facie case, the burden then shifts to the employer to "produc[e] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason."   Reeves, 530 U.S. at 142 (quoting Burdine, 450 U.S. at 254).   This burden is one of production, not persuasion; it "can involve no credibility assessment."   Id. (quoting St. Mary's Honor Center v. Hicks, 509 U.S. 502, 509 (1993)).   If the employer does so, the presumption of discrimination drops from the case, and the burden shifts back to

_____

[11]Plaintiff does not contend that she might offer direct evidence or statistical evidence of race discrimination, the other avenues by which he might have attempted to prove her Title VII and § 1981 disparate treatment claims.  See Standard, 161 F.3d at 1330.

the plaintiff to discredit the proffered nondiscriminatory reasons by showing that they are merely a pretext for unlawful discrimination. See Reeves, 530 U.S. at 143; McDonnell Douglas, 411 U.S. at 802-05; Burdine, 450 U.S. at 252-256.

In examining Plaintiff's promotion claims, the Court will assume for purposes of summary judgment that she has established a prima facie case on each. That is, the Court will assume that the evidence, when viewed in the light most favorable to Plaintiff, reasonably indicates that the positions she desired were available, that she is at least minimally qualified for each,[12] that Defendant

---

[12]The Court believes that the "qualification" element of the prima facie case is the only one that is potentially subject to a colorable argument that Plaintiff has not met it, at least with regard to some of the positions in question. However, to prove that she was qualified for purposes of establishing a prima facie case, Plaintiff need only show that she met the minimum eligibility qualifications of the job, not that she possessed all of the qualities that an employer might prefer, but not absolutely require, a candidate to have. See Carter v. Three Springs Residential Treatment, 132 F.3d 635, 642 (11th Cir.1998). See also St. Mary's Honor Center v. Hicks, 509 U.S. 502, 513 (1993) (indicating that an applicant who applies but is rejected "for an opening for which he is minimally qualified" (emphasis added) and the search to fill the opening continues has established a prima facie case under McDonnell Douglas). Here, it is admitted that Defendant does not require its associates to have any kind of formal or objective minimum qualifications to be eligible for a promotion to management. Further, Plaintiff's alleged lack of subjective qualifications are based upon supposed deficiencies Potts perceived in aspects of her work performance that are intertwined with the reasons that he says caused him not to promote her to a management job. Because of this, the Court concludes that it is more appropriate to consider Plaintiff's alleged lack of qualifications at the second and third stages of the McDonnell Douglas analysis. Cf. Hollifield v. Reno, 115 F.3d 1555, 1562 n.3 (11th Cir. 1997) (indicating that where the issue of the employee's work performance is intertwined with the issue of whether the reasons for his termination were pretextual, it is more appropriate to examine the employee's work performance at the later stages of McDonnell Douglas, rather than at the qualifications element of the prima facie stage).

had some reason or duty to consider her for the positions,[13] and that the positions were filled by individuals who were either Caucasian or lighter-skinned than Plaintiff.[14] See McDonnell Douglas, 411 U.S. at 802; Sledge, 275 F.3d at 1015 n.1; Walker v. Mortham, 158 F.3d 1177, 1192 (11th Cir. 1998); Crawford v. Western

---

[13]Generally, a plaintiff claiming that she was discriminatorily denied a promotion must show that she actually applied for the position in question as part of her prima facie case. See, e.g., Taylor v. Runyon, 175 F.3d 861, 866 (11th Cir. 1999); Combs v. Plantation Patterns, 106 F.3d 1519, 1539 n. 11 (11th Cir. 1997). However, where an employer has an informal promotion procedure, such as where job openings are not posted or the employer does not require employees to submit applications in order to be considered for a promotion, an employee may establish this element of the prima facie case simply by showing that the position was available and that the employer had some reason or duty to consider him for the post. See Jones v. Firestone Tire and Rubber Co., Inc., 977 F.2d 527, 533 (11th Cir. 1992); Carmichael v. Birmingham Saw Works, 738 F.2d 1126, 1133-34 (11th Cir. 1984). Defendant does not dispute that it had such an informal promotion system and that the more relaxed requirements of this element therefore would apply. See Defendant's Brief at 44. Moreover, the evidence indicates that Defendant had some reason to consider Plaintiff for these promotions given that she undisputedly told the relevant decisionmaker, Potts, that she desired to be promoted to a management position.

[14]Defendant suggests that Plaintiff is also required to prove, as an element of her prima facie case, that she was equally or more qualified than the person who ultimately received the job, not just that the person was of a different race or color. Indeed, there are numerous Eleventh Circuit opinions, both recent and not so recent, suggesting that such is a requirement of a prima facie case on promotion claims. See, e.g., Denney v. City of Albany, 247 F.3d 1172, 1183 (11th Cir. 2001); Alexander v. Fulton County, Ga., 207 F.3d 1303, 1339 (11th Cir. 2000); Combs v. Plantation Patterns, 106 F.3d 1519, 1539 n. 11 (11th Cir.1997); Wu v. Thomas, 847 F.2d 1480, 1483 (11th Cir. 1988); Perryman v. Johnson Products Co., Inc., 698 F.2d 1138, 1142 n.7 (11th Cir. 1983) (each listing as a prima facie element the requirement that a plaintiff prove that other employees with "equal or lesser qualifications" who were not members of the protected minority were promoted). However, an Eleventh Circuit panel has squarely held, after an exhaustive review of circuit precedent, that a plaintiff seeking to establish a prima facie case of discriminatory failure-to-promote is not required to show, as part of her prima facie case, that her qualifications are equal or superior to those of the successful applicant. See Walker v. Mortham, 158 F.3d 1177 (11th Cir. 1998). Language to the contrary in subsequent panel decisions appears to be dicta, but even if it is not, such decisions cannot overturn Walker's express holding on the point, pursuant to the "prior panel" precedent rule governing in this circuit. See id. at 1188-89; Smith v. GTE Corp., 236 F.3d 1292, 1300 n.8 (11th Cir. 2001).

Elec. Co., Inc., 614 F.2d 1300, 1315 (5th Cir. 1980).

The burden now shifts to Defendant to produce evidence sufficient to indicate that it actually rejected Plaintiff, or preferred someone else, for these positions because of one or more legitimate, non-discriminatory reasons. Potts acknowledges that he made the employment decisions at issue, that led him to place others in the management positions Plaintiff desired. He further admits that Plaintiff did tell him that she was interested in becoming a manager. However, Potts states that he never actually considered promoting her to any of the positions in question because he does not believe that she is qualified to be a manager.

Potts acknowledges that he believes that Plaintiff is a "good employee" and a "good associate" in many respects.[15] There is also evidence indicating that Potts told Joe McConnell when he took over bedding manager duties that he could learn from Plaintiff and that he should not be afraid to ask her questions. Nonetheless, there are several facets of Plaintiff's work performance that allegedly indicate to Potts that she is not "management material." One thing he cites is that he considers Plaintiff's use of time to be

---

[15]Specifically, Potts admitted that Plaintiff does a "good job at maintenance" and that she generally can do a specific task when given detailed instructions. He further states that she has a "good eye for merchandise matching" that allows her do a "good job" in creating and preparing display beds. He also concedes that Plaintiff is "good at customer service," and that she receives customer compliments, probably even "more than the average."

inefficient.  For example, he says that while she may prepare an appealing display bed, she sometimes takes "all day" to do it, rather than the approximately two to four hours that he considers should be necessary.  Likewise, although she may provide service that satisfies customers, she tends to talk to each customer for too long instead of helping them find what they need and getting them out of the store quickly and moving on to the next task. Another problem with Plaintiff's customer service, as far as the store is concerned, Potts alleges, is that on a number of occasions she has taken special orders for customers without completing the appropriate forms and made promises to them without advising other employees. As a consequence, Potts claims that customers Plaintiff handled have contacted the store to check on their orders when she is not there and other employees are unaware of what the customers are talking about.  Potts says that Plaintiff also does not communicate problems or ideas to management and instead tends to discuss inappropriate matters involving the store with other associates.  As specific examples, Potts offers two:  that Plaintiff has complained to other associates about scheduling problems regarding her daughter, Alexis "Special" Jones, who was also employed as an associate at the Hoover store, and that Plaintiff "speaks freely" at work with other associates about the instant lawsuit.  Potts also maintains that Plaintiff sometimes

Page 28 of 44

fails to focus and follow through completely on tasks, as she has, for instance, left out supplies utilized or merchandise taken down after she has prepared display beds.  Finally, Potts relates that early one morning Plaintiff reported for work, but there was a mix-up on scheduling and Silverberg was not there to open the store. Instead of attempting to telephone or otherwise contact a manager or someone at the other store operated by Defendant several miles away, Plaintiff simply went home.  Potts states that this episode was indicative to him that Plaintiff does not "think globally" like a manager, although he concedes that this single error in judgment on her part did not, in itself, disqualify her from a promotion.

In addition, Defendant offers evidence indicating that Potts selected other individuals for four of five positions in question for legitimate reasons.[16]  Potts stated that he placed Leslie Davis, a white female, in the assistant store manager-operations position in September 1999, based upon her work ethic and job performance, exhibited during the previous three years in department, front-end,

---

[16]Defendant has not directed the Court to, nor has the Court's own examination of the record revealed, any evidence indicating why Defendant moved Lila Yettou to the bedding manager position in September 2000.  Potts hired Lila Yettou, a white female, in August 2000 from outside the company to be the department manager for hard-lines at the Hoover store.  Potts explains that he hired her because of her prior management experience and because she "interviewed well."  However, the position that Plaintiff claims she was denied on the basis of race involving Yettou was the bedding department manager job into which Yettou was moved about a month after she started.  The record does not appear to contain evidence of why this particular move was decided upon, by Potts or anyone else.

and assistant store management positions at Defendant's Hoover and Mountain Brook stores.   Potts states that he moved Lisa Greer, a white female, into the bedding department manager job in October 1999 because of her "performance, including her supervisory and management experience at the company, her strong work ethic, and her good communication with management."   Prior to becoming the bedding department manager, Greer had been the front end manager of the Hoover store since June 1998.  Potts explains that he decided to move Lorre Prisby, an African-American who is lighter skinned than Plaintiff, to a sales force manager position in late February or early March 2001 because of her prior supervisory experience, she had been trained for the position by the outgoing incumbent sales force manager, and because she had successfully performed the duties of the position during a 60-day trial period while working in an hourly sales force clerical job.   And finally, the record indicates that Potts decided to move Joe McConnell into the bedding manager position in March 2001 as part of rotating him through the various departments to gain experience in each one, and he had already been manager of the bath, lifestyles, and housewares departments.[17]

---

[17]Defendant contends that Plaintiff is precluded from recovering on her claims that she was denied promotions to bedding department manager positions awarded to Greer, Yettou, and McConnell because these employees were already in management, so the moves were lateral ones, not promotions, for the successful candidates.   Defendant cites no authority in support of

The Court concludes that the foregoing evidence satisfies Defendant's burden at the intermediate stage of the McDonnell Douglas framework with regard to each promotion. The evidence indicates that Potts rejected Plaintiff as a viable candidate for any management position for legitimate, non-discriminatory reasons, and there is evidence reasonably additionally suggesting valid reasons for his placing four of the five successful candidates for the jobs.[18]  Thus, whether Plaintiff's promotion claims come down to the third and final stage of McDonnell Douglas: pretext.

At the pretext stage, in order to survive summary judgment, Plaintiff must provide sufficient evidence to allow a reasonable

---

this argument, and the Court finds it to be utterly without merit. Whether an employment action is materially adverse is viewed from the perspective of a reasonable person in the employee's position. Cf. Doe v. Dekalb County School Dist., 145 F.3d 1441, 1449 (11th Cir. 1998) ("An ADA plaintiff must demonstrate that a reasonable person in his position would view the employment action in question as adverse.") (Emphasis added). It is undisputed that a move to bedding department manager would have been a promotion for Plaintiff. Thus, it is elementary that her non-selection for each of them constitutes an adverse employment action that will support a disparate treatment claim under Title VII and § 1981. See Pennington v. City of Huntsville, 261 F.3d 1262, 1267 (11th Cir. 2001) ("[G]enerally the denial of a promotion is an adverse employment action.")  The fact that the successful candidates' placements were lateral moves for them might shed some light on a decision-maker's perception that they were more qualified than Plaintiff because of their previous managerial experience, but such in no way alters the fact that Plaintiff was denied a position that would have conferred her with improved "compensation, terms, conditions, or privileges of employment."

[18]Although Defendant has not pointed to evidence regarding why Yettou was moved into the bedding manager job, the Court concludes that the evidence of the ostensible legitimate reasons offered by Potts for rejecting Plaintiff for consideration for any management position still satisfies Defendant's burden at the intermediate stage of McDonnell Douglas with regard to the position given to Yettou. See Reeves, 530 U.S. at 142 (stating that the employer must "produc[e] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." (quoting Burdine, 450 U.S. at 254) (emphasis added)).

fact finder to conclude, at a minimum, that the proffered reasons
were not actually the motivation for the employer's decision.  See
Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997),
cert. denied, 118 S.Ct. 685 (1998).  Plaintiff may do this (1) by
showing that the employer's legitimate nondiscriminatory reasons
should not be believed;  or (2) by showing that, in light of all of
the evidence, a discriminatory reason more likely motivated the
decision.  Mayfield v. Patterson Pump Co., 101 F.3d  1371, 1376
(11th Cir. 1996).  See also Reeves v. Sanderson Plumbing Products,
Inc., 530 U.S. 133, 148 (2000) (holding that "a plaintiff's prima
facie case, combined with sufficient evidence to find that the
employer's asserted justification is false, may permit the trier of
fact to conclude that the employer unlawfully discriminated," but
cautioning that such a showing may not always be adequate to
sustain a finding of unlawful discrimination).

       As a threshold matter, it should be noted that in cases such
as this,

       federal courts "do not sit as a super-personnel
       department that reexamines an entity's business
       decisions.  No matter how medieval a firm's practices, no
       matter how high-handed its decisional process, no matter
       how mistaken the firm's managers, [federal anti-
       employment discrimination statutes do] not interfere.
       Rather, our inquiry is limited to whether the employer
       gave an honest explanation of its behavior."

Id. (quoting Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470

(11th Cir. 1991) (further citations omitted) (bracketed material added).    Further, a "plaintiff is not allowed to recast an employer's proffered non-discriminatory reasons or substitute his business judgment for that of the employer.   Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc).   Thus, "[p]rovided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." Id.

Plaintiff first argues that she has shown pretext because the reasons Potts offers for rejecting Plaintiff and preferring others for the management positions are based upon subjective criteria. Initially, the Court notes that Potts stated specifically that, as part of his evaluation of an individual's "performance" or work history, he considers whether he or she has supervisory and managerial experience, an objective factor, when deciding who to place in a particular management position.   Indeed, all five of the individuals placed in the positions Plaintiff desired had prior managerial or supervisory experience, either with Defendant or with other companies or both.    Plaintiff, by contrast, has no such experience.   But even with regard to other, subjective factors, the Eleventh Circuit has held that "[a] subjective reason is a legally sufficient, legitimate, nondiscriminatory reason [under the

McDonnell Douglas/Burdine analysis] if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion." Chapman, 229 F.3d at 1034.

Here, Potts has given several specific examples underlying his opinions regarding Plaintiff's deficiencies.  For instance, Potts cited as an instance indicating that Plaintiff was not ready for supervisory responsibilities the episode where no manager reported to open the store and Plaintiff simply went home.  Plaintiff does not deny that such occurred, instead offering only that she waited for 45 minutes and then did not have her cellular phone with her and that she was "afraid to exit [her] vehicle to use a payphone." Nor does Plaintiff offer evidence contesting Potts's specific assertion that she has on occasion failed properly to put away merchandise and supplies after preparing display beds.  Plaintiff also does not point to evidence disputing Potts's claim that she does not communicate ideas or problems well with management.  She asserts, instead, that she prefers to handle things herself.  The Court concludes that Potts has offered a sufficient factual predicate to support the subjective reasons he gives for not promoting Plaintiff.  Thus, it is up to Plaintiff to offer evidence rebutting them, and this, the Court finds, she has not done.

Plaintiff's pretext argument also focuses upon her assertion that she was more "qualified" than the individuals who received the

positions in question.  However, the Eleventh Circuit has recently cautioned,

> "In a failure to promote case, a plaintiff cannot prove pretext by simply showing that she was better qualified than the individual who received the position that she wanted. . . .  '[D]isparities in qualifications are not enough in and of themselves to demonstrate discriminatory intent unless those disparities are so apparent as virtually to jump off the page and slap you in the face.'"

Denney v. City of Albany, 247 F.3d 1172, 1187 (11th Cir. 2001) (quoting Lee v. GTE Florida, Inc., 226 F.3d 1249, 1253-54 (11th Cir. 2000)  (further  citations  omitted)).   Given  the  managerial experience  of  the  employees  who  Potts  put  in  the  positions, compared  with  Plaintiff's  lack  thereof,  it  cannot  be  reasonably said  that  Plaintiff  is  so  much  more  qualified  than  the  successful candidates that her non-selection alone demonstrates pretext.

     Moreover, many of the particulars of Plaintiff's argument that she was more qualified largely ignore, rather than meet head-on, the specific reasons offered by Potts underlying his opinion that Plaintiff  was  not  qualified  to  be  a  manager.   For  example, Plaintiff  contends  that  she  was  more  qualified  because  she  had greater  service  time  with  the  company  and  had  acquired  greater product  knowledge,  especially  in  the  bedding  department.   Neither Potts nor any other representative of Defendant appears to dispute Plaintiff's qualifications in those specific areas, however.  Potts

explained, rather, that he does not consider service time in deciding whether to place an individual in management, and he stated that product knowledge was only a "secondary factor" in such a decision, less important than his perception of an individual's ability to focus on and complete assignments, perform multiple tasks at one time, communicate with management, and manage their time.  While Plaintiff may believe that Defendant's promotion and personnel decisions should be based upon service time and product knowledge, she cannot show pretext merely by calling into question the wisdom of Potts's view that such factors are of relatively minor importance compared to other qualities that might motivate a reasonable employer.

Similarly, Plaintiff argues that Potts's assertion that he finds problems with her customer service skills to be pretextual. She emphasizes that her employee reviews have consistently indicated above-average marks in the category and that she has received numerous compliments and favorable comment cards from customers.  Again, however, Plaintiff does not really meet this reason directly.  The evidence does not indicate that Potts completed the employee reviews in question, although he admits that he considers Plaintiff to be "good" at customer service, and that she does indeed provide courteous service that largely satisfies customers.  However, he contends that Plaintiff spends inordinately

long periods of time serving each customer rather than helping them and moving on. He also alleges that she has placed special orders for items and made promises to customers without advising other store employees. Thus, the focus of Potts's "customer service" reason is that Plaintiff's performance is symptomatic of her lack of communication with other store employees and managers, rather than a problem relating to how customers view her. Moreover, Plaintiff has not offered substantial evidence contradicting Potts's assertions.

In short, based on the foregoing, the Court concludes that Plaintiff has not offered substantial evidence indicating that Potts did not honestly perceive the deficiencies he cites regarding Plaintiff's work or that such legitimate reasons motivated him to reject the possibility of promoting her to a management position. Nor has Plaintiff created a genuine issue of fact with respect to the reasons Potts cites as motivating his decisions to choose the individuals who received the jobs Plaintiff desired. Plaintiff also attempts, however, to show that it is more likely that a discriminatory reason caused her to be rejected for the promotions.

Plaintiff first alludes to evidence she claims shows that Randi Silverberg harbors a racial bias. Plaintiff points to deposition testimony given by McDonnell to the effect that Silverberg allegedly instructed him to follow customers around the

store to prevent them from shoplifting and that these customers were always African-American.  Plaintiff also refers the Court to testimony by Lila Yettou that she believed Silverberg favored a white employee over a black employee to fill a certain position and that she generally treated another black employee worse than his co-employees who were white.  It might be assumed that such events occurred and that they tend to indicate that Silverberg harbors some sort of racial bias.  However, Potts states that it was he who made the decision not to promote Plaintiff and that he never discussed whether or not to promote Plaintiff with any of his store managers.  There is insufficient evidence to suggest that Silverberg actually played a role in Potts's decision to reject consideration of Plaintiff for the promotions in question.  And comments indicating an improper bias by non-decisionmakers generally do not raise an inference of discrimination or pretext on the part of the employer.  See Mitchell v. USBI Co., 186 F.3d 1352, 1355 (11th Cir. 1999); Conto v. Concord Hosp., Inc., 265 F.3d 79, 81 n.4 (1st Cir. 2001); Cardenas v. AT & T Corp., 245 F.3d 994, 1000 (8th Cir. 2001).  The Court concludes, therefore, that Silverberg's statements do not show pretext.

Plaintiff also cites an instance in which McConnell allges that Potts "insinuated" that he wanted three African-American employees, "Vincent," "Darryl," and perhaps also Plaintiff's

daughter, Special, to be fired. The Court concludes, however, that this evidence falls far short of suggesting that Potts decided not to promote Plaintiff based upon her race or color. First, there is no indication that such statement was at all related to Potts decision not to promote Plaintiff. But more fundamentally, the context of this alleged statement is entirely unclear; even if Potts indicated that he wanted certain black employees fired, without further information it cannot even reasonably be inferred that the employee's race was a motivating factor in that desire. Indeed, McConnell stated that he was not aware that Vincent or Darryl were ever actually terminated, and he conceded that he himself did not believe that they were particularly good employees. The Court concludes that Plaintiff has failed to present sufficient evidence to indicate that race or color was more a likely reason that she was not promoted. Accordingly, the Court holds that Plaintiff has failed to show pretext and that her disparate treatment promotion claims under Title VII and § 1981 are due to be dismissed.

### E.  Retaliation Claims

Plaintiff also claims that Defendant retaliated against her because she filed an EEOC charge and this lawsuit. The relevant provision of Title VII prohibits an employer from "discriminat[ing] against any of his employees . . . because he has made a charge,

testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]. 42 U.S.C. § 2000e-3(a). In order to establish a prima facie case of retaliation under Title VII, an employee must show: (1) she participated in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment decision. <u>Pipkins v. City of Temple Terrace, Fla.</u>, 267 F.3d 1197, 1201 (11th Cir. 2001). There is no question that Plaintiff has engaged in protected activity by virtue of the filing both her EEOC charge and this lawsuit. <u>See</u> <u>Bass v. Board of County Com'rs, Orange County, Fla.</u>, 256 F.3d 1095, 1117 (11th Cir. 2001); <u>Berman v. Orkin Exterminating Co.</u>, 160 F.3d 697, 702 (11th Cir. 1998); <u>Jordan v. Wilson</u>, 851 F.2d 1290, 1292 (11th Cir. 1988). Defendant argues, however, that Plaintiff has not suffered an adverse employment action that will support her retaliation claim.

First, Plaintiff has alleged that she suffered an adverse employment action in that Defendant terminated her daughter, Special Jones, after she filed her EEOC charge. Defendant admits that it fired Plaintiff's daughter, although it claims such was done because of Jones's poor attendance. But on a more basic level, Defendant argues that an adverse action taken against

Plaintiff's daughter, even assuming that it was for a retaliatory reason,[19] does not constitute an adverse action for which Plaintiff might recover. The Court agrees.  The Eleventh Circuit does not appear to have addressed this issue, and courts appear split on the related issue of whether a person who has suffered the adverse employment action allegedly based upon a family member's protected activity may bring  a Title VII retaliation action.  Compare Smith v. Riceland Foods, Inc., 151 F.3d 813, 819 (8th Cir. 1998), and Holt v. JTM Indus., Inc., 89 F.3d 1224, 1226-27 (5th Cir. 1996), with Thurman v. Robertshaw Control Co., 869 F. Supp. 934, 941 (N.D. Ga. 1994), and Gonzalez v. New York State Dept. of Correctional Services Fishkill Correctional Facility, 122 F. Supp. 2d 335, 347 (N.D.N.Y. 2000). Evidence that Plaintiff's daughter was terminated because of protected activity Plaintiff engaged in could tend to indicate a retaliatory animus against Plaintiff and might perhaps be  relevant  to  a  claim  that  Plaintiff  was  subjected  to  a retaliatory hostile work environment.  However, the Court concludes that an injury done to another, even if a family member, does not itself constitute an adverse employment action for which Plaintiff might recover.  See Probst v. Reno, 1995 WL 613129, *8 (N.D. Ill. 1995);   Lien v. Wilson & McIlvaine, 1988 WL 84726, at *5 (N.D.

---

[19]The Court would note that it does not believe that there is sufficient evidence indicating that the reason offered by Defendant for firing Jones is pretextual.

Ill. 1988)(finding that plaintiff could not assert a claim based on retaliatory conduct against her husband).

Next, Plaintiff claims that she suffered an adverse employment action because Silverberg allegedly instructed managers not to use Plaintiff to help out in their departments because she was a maintenance employee. The Court concludes, however, that the evidence fails to suggest that Plaintiff actually suffered any material change in her working conditions as a result of this action. There is no indication that Plaintiff suffered any kind of economic repercussions from this alleged instruction to managers from Silverberg. Nor is there any indication that her job title or description changed. Indeed, Plaintiff herself does not indicate how her job duties actually changed at all, as she further admitted that the managers continued to call on her just as they had before the instruction. Therefore, the Court concludes that the instruction not to depend on Plaintiff is not sufficient to show that Plaintiff endured any material adversity as required to support a retaliation claim.

Finally, Plaintiff contends for the first time in her summary judgment brief and an accompanying affidavit that she has been subjected to retaliation in the form of not being considered for promotions. However, there is no such claim in her complaint, and she did not even allege it during her deposition, despite being

asked specifically to explain all of the facts underlying her retaliation claims. Moreover, Plaintiff has not even at this time sought to specify any positions that she has allegedly been denied following her filing of her EEOC charge or her lawsuit. Plaintiff may be able to pursue such claims, but she will have to file a separate lawsuit if she wishes to do so.

The Court concludes that Plaintiff has failed to present evidence reasonably suggesting that she suffered an adverse employment action necessary to support her Title VII retaliation claim. And while there is some doubt in this circuit regarding the elements and scope of retaliation claims under § 1981, see Bass v. Board of County Com'rs, Orange County, Fla., 256 F.3d 1095, 1120 n.10 (11th Cir. 2001); Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1463 n. 4 (11th Cir. 1998), suffice it to say that the Court concludes that its determination that Plaintiff has failed to show an adverse employment action for purposes of a Title VII retaliation claim also forecloses such a retaliation claim under § 1981.

### V. CONCLUSION

Based upon the foregoing, the Court concludes that Defendant's motion for summary judgment (Doc. 27) is due to be granted on all of Plaintiff's claims. The Court has determined that there is no genuine issue of material fact and that Defendant is entitled to

judgment as a matter of law on all of Plaintiff's claims, alleging discrimination and retaliation in violation of Title VII and § 1981.  Fed. R. Civ. P. 56.  Accordingly, Plaintiff's claims, and this action, are due to be dismissed, with prejudice.  A separate order will be entered.

**IT IS SO ORDERED**, this _____ 31 ST day of January, 2002.

_____
H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE